STATE ex rel. JARVIS et al., Plaintiffs, v. BROWN, et al., Defendants.

(145 N. W. 444.)

1. **Counties—County Seat—Selection—General Election—Candidacies —Constitution, and Statute—Construction.**

Under Const., Art. 9, Sec. 2, providing that, in counties already organized, where the county seat has not been located by majority vote, the county board shall submit the location of county seat to the electors at a general election, and the place receiving a majority of all votes cast at such election shall be such county seat, **held,** that, the location of a county seat, under said section, can only be had at a general election, and every place in the county has a constitutional right to have its candidacy submitted at such election, and every elector has a constitutional right to cast a vote at a general election, for any town or place seeking to be such candidate; and hence no statute purporting to provide a method for submission of question of what towns may be candidates for county seat of such county, at a primary election, is effective to eliminate any town from consideration of the electorate at the time fixed by the constitution for expression of the elector's choice.

2. **County Seat—Selection—Constitutional Provision, Construction of—"Counties Already Organized"—Statute Inapplicable.**

Under Const., Art. 9, Sec. 1, providing that the Legislature shall provide by general law for organizing new counties, locating county seats, and that all changes in county boundaries, in counties already organized, before taking effect, shall be submitted to the electors of the county or counties to be affected at the next general election thereafter; and Sec. 2, declaring that "in counties already organized," where county seat has not been located by majority vote, the county board shall submit the location of county seat at a general election, **held,** that the words "in counties already organized," in Sec. 2, had reference, not to date of adoption of the constitution, but to time when application of the provision is sought to be made; and hence, where no permanent county seat of the county had ever been selected, an application for such selection must be made under Sec. 2, at a general election, and that Laws 1911, Ch. 112, providing for elimination of candidates for county seats at a primary election, is not applicable.

(Opinion filed February 18, 1914.)

Original application for writ of mandamus by the State, on relation of H. S. Jarvis and another, against H. W. Brown, and others, constituting the County Commissioners of Gregory County,

and F. T. Ambroz, as County auditor of such county.  Writ denied.

*J. F. Frame, and W. J. Hooper,* for Relators.

The only provision in the Constitution which has any bearing on the question at issue is Section 1.  This court in the case of State Ex- Rel Casper v. Porter et al., 13 S. D. 126, has expressly held that the provision of Section 2 of Article 9 applies simply to counties organized at the time of the adoption of the Constitution, and where the county seats had not been located by majority vote at that time.  This is clearly correct, as any other construction would render the words "already organized" superfluous and with no meaning whatever.  There never was by statute a limitation on the right to vote for the location of county seats in counties organized since the adoption of the Constitution, excepting that the vote must be at a general election.

At the first session of the legislature of this state,, Chapter 64 of the Laws of 1890 was passed. This contains three sections.

This law was enacted solely under the provisions of Sec. 2, Art. 9, of the constitution, and it had no application to counties which were to be organized after the adoption of the constitution.  In Sec. 1, it expressly refers to Section 2, of Article 9, and says that the election shall be had as provided in section 2 of article 9, of the Constitution.  And in section 2, which limits the right to vote oftener than four years, it provides that when no city or town shall have received the vote required by the constitution, the question shall not be submitted again for four years. This clearly applies to the counties referred to in section 2, because there is no provision whatever in the Constitution for locating county seats in counties organized subsequent to the adoption of the Constitution.

That Chapter 64, Laws of 1890, applied only to counties organized at the time of the adoption of the Constitution, is apparent by the revision of 1903.  Secs. 791, 792, 793, Pol. Code.

Chapter 112 of the Laws of 1911 is the first law since statehood which has been passed under the provisions of section 1, article 9, Constitution.  It cannot apply to counties organized prior to the adoption of the Constitution, for the reason that the location of the county seats in those counties is controlled absolutely by section 2 of article 9, and the machinery to carry it into

effect was provided for in chapter 34 of the laws of 1890, and again by section 791 and 792 of the Revised Political Code of 1903. This chapter under consideration therefore applies solely to counties organized since the adoption of the Constitution.

There is no limitation in this law as it stands, on the right to vote at every election. The only limitation is that the question can be submitted only as between candidates who have filed a petition with the county commissioners and then at the general election between the two places receiving the highest number of votes at the primaries.

Section 791, Pol. Code, as amended by Laws 1911, ch. 112, provides for one election for county seat to be held at the time of the primaries. Section 2, Ch. 112, Laws 1911, provides for a second election to be held at the time of the general election, but limits the names going on the ballot to the two places receiving the highest number of votes at the first election.

The Constitution, by section 1, article 9, expressly gives the right to the legislature to pass this law of 1911. At the time of the enactment of that law there was no general law in this state applicable to the location of county seats in counties organized subsequent to the adoption of the Constitution.

*Chas. A. Davis,* and *French & Orvis,* for Respondents.

Chapter 112, Laws of 1911, under which this proceeding was instituted, is in conflict with Section 2, Article IX., of the Constitution, and is therefore void.

Assume for the purpose of argument that the county seat of Gregory County has not been located by a majority vote within the meaning of Section 3, of Article IX., of the State Constitution.

Under that section no election is referred to except the general election, which is held in November of each of the even numbered years, and under this section any town, city or place in the county may be a candidate for the county seat, and may have a place on the ticket at the general election, and be voted for for county seat, and if any such town, city or place receives a majority of all the votes cast at the election such town, city or place shall be the county seat of the county.

It is not within the power of the legislature to enact any statute in any way conflicting with this provision of the state Constitution.   State ex rel. Adkins v. Lien, 9 S. D. 297.

Chapter 112, Laws 1911, is not only in conflict with the Constitution, but if we are wrong in this contention, then under Section 794 of the Revised Political Code, the question of locating the county seat of Gregory County cannot be submitted to the electors of that county until the general election in 1916.

WHITING, J. Sections 1 and 2 of article 9 of the Constitution read as follows, the underscoring being ours:

"Section 1.   The Legislature shall provide by general law for organizing new counties, locating the county seats   thereof   and changing county lines. * * * All changes in county boundaries *in counties already organized,* before taking effect shall be submitted to the electors of the county or counties to be effected thereby, at the next general election *thereafter* and be adopted by a majority of the votes cast in each county at such election.   Counties now organized shall remain as they are unless changed according to the above provisions.

"Sec. 2.   *In counties already organized* where the county seat has not been located by a majority vote, it shall be the duty of the county board to submit the location of the county seat to the electors of said county at a *general election.* The place receiving a majority of all votes cast at said election shall be the county seat of said county.".

Chapter 112, Laws 1911, purports to provide a method whereby, through petition filed with the county auditor of an organized county, any town or place desiring to be a candidate for county seat may require the county commissioners to submit to the qualified electors of such county at the approaching primary election, the question of what towns may be candidates for county seat of such county; under such law, any town in behalf of which a petition has been filed may have its name placed upon a special ballot to be cast at such primary election, and the two places receiving the highest number of votes cast at such primary shall be the candidates for the permanent county seat, and shall be voted on as such at the general election following said primary.   A primary election is to be held in this state on March 24, 1914, and, within

15—Vol. 33, S. D.

the time prescribed, petitions, concededly sufficient under such law, were filed with the county auditor of Gregory County—one requesting that the name of the town of Burke be placed, as a candidate for county seat, on a ballot to be used at such primary election; the other requesting that the name of the town of Herrick be so placed on such ballot. The board of county commissioners of said county refused to submit the question, basing its action solely upon the ground that, "under the law, the question of the location of the county seat cannot be submitted until 1916;" and such board rejected both of the petitions. The county auditor, in conformity with the action of the board of commissioners, refused to give notice of submission of the question of what towns should be candidates for county seat, and refused to prepare the necessary ballots for the submission of such question. Relators, electors, and taxpayers of said Gregory county brought this original proceeding and are seeking a writ requiring the respondents, as such board of county commissioners and county auditor, to comply with said petition—to submit the question of candidates for permanent county seat to the electors of said county at said primary election, to give notice of such submission and to prepare and furnish the necessary ballots to be used upon the submission of such question.

The following are undisputed facts herein: The Constitution of this state was adopted in the year 1889; Gregory county was organized at an election held in the year 1898; at such election the town of Fairfax was chosen as the county seat of said county, and has so remained to this date. Relators contend, and for the purposes of this proceeding it will be taken as established, that Fairfax was chosen as merely a temporary county seat, and still remains such, and that therefore the election sought to be held would not be one to *change* the location of a county seat that had once been *located by a majority vote,* and thus be controlled by section 3, Art. 9, of the Constitution.

Relators base their rights upon the claim that section 2 of said article has no application whatsoever to the selection of a permanent county seat for Gregory county; it being their contention that section 2 applies only to counties that were organized *prior to the adoption of the Constitution,* and that the selection of a permanent county seat for Gregory county is controlled entirely by section 1 and laws enacted thereunder.

[1] The ultimate end sought by relators is that there be a permanent county seat chosen for Gregory county at the *general election* next November.   Would the selection of a county seat for Gregory county, at such general election, be a selection under section 2?   It is too clear to need argument or citation of authority in support thereof that, when a county seat is to be located under said section 2, it can only be at a general election; and it follows that if the selection of a permanent county seat for Gregory county is a selection under such section, every place has a constitutional right to have its candidacy submitted at a *general election,* and every elector of said county has the constitutional right to cast his vote at a *general election* for any town or place seeking to be such candidate—no statute can, through any primary election, eliminate any town from the consideration of the electorate at the time fixed by the Constitution for the expression of the electors' choice.

[2] But relators contend that the Legislature has full power to provide the time or times and the method for the selection of a permanent county seat for all counties which have been organized *since the adoption of the Constitution,* and they base their contention upon the words, *"In counties already organized,"* found at the beginning of section 2, contending that those words limit the application of the provisions of such section to counties organized *after the adoption of such section.*   They contend that this court so held in the case of State ex rel. Cosper v. Porter et al., 13 S. D. 126, 82 N. W. 415. It is true that, in describing the class of counties to which Roberts county belongs, and in holding that such class came under the provisions of said section 2, the court noted that such county was organized *prior to the adoption of the Constitution.* The question whether it would have taken it out from the provisions of such section, if it had not been organized until after such Constitution was adopted, was not before the court at that time, and no views were advanced thereon.

It would be exceedingly strange if the framers of our constitution and the electors who adopted the same intended to keep all counties that should be organized after the adoption of such Constitution—even after they had been organized—in a class separate and distinct from, and with their residents subject to rights and powers different from, those counties which chanced to have

been organized prior to the adoption of such Constitution. A more unwise act could hardly be imagained, and we certainly should hesitate long before holding that they did such an unreasonable and indefensible thing. How much more consonant with reason it is to say that they intended the provisions of the fundamental law of this state to be continuing in their effect—that it is the status at the time the application of the provisions of he Constitution is sought to be made, rather than the status at the time of the adoption of the Constitution, that determines the application of its provisions! It is certainly in accordance with reason to say that the provisions of such section apply to any organized county, regardless of the time of its organization, provided it had never located its county seat by a majority vote.

We find this same phrase, "in counties already organized," in section 1, in connection with changes of county boundaries, and we certainly should presume that it was intended that this phrase should have the same meaning in both sections. In that section it is clear that the words "already organized" refer to and relate to the time when the change is sought to be made because of the word "thereafter" in said sentence. If those words "already organized" related to the time of the adoption of the Constitution, then in lieu of the word "thereafter" the Constitution would have used the words "after the adoption of the Constitution." Our present interpretation is further corroborated by the last sentence of said section 1, which provides that, "counties now organized shall remain as they are unless changed according to the above provisions," thus making a definite provision for then existing counties. If the words "already organized" related to the time of the adoption of the Constitution, that sentence was superfluous. Chapter 64, Laws 1890, was enacted during the first session of the Legislature held during statehood, and immediately after the adoption of our Constitution. When we compare the provisions of said chapter 64 with those provisions of our Constitution relating to location and change of county seats, it will be found that, in the light of the construction which we have placed upon such sections, said chapter 64 was a complete, clear, and unambiguous law for locating and changing county seats, and this whether the county seat to be located or changed be one for a county organized prior to or subsequent to the adoption of the Constitution. The mem-

bership of such Legislature was composed largely of men who had been members of the convention which framed our Constitution. If relators are right in the construction that should be given the words "in counties already organized," the Legislature remains unrestricted in its power to change the boundaries of any and every county that has been organized since statehood—no proposed change need be submitted to the voters of such county for their ratification—while the boundaries of all the older counties cannot be changed unless the act of the Legislature changing same is ratified according to the provisions of section 1. That our legislators have placed no such unreasonable construction upon such phrase is evidenced by the fact that, when it has sought to change the boundaries of a county organized since the adoption of section 1, it has been careful to submit the question of such change to a vote of the electors of such county. See chapter 45, Laws 1897.

The writ sought for is denied.